Matthew Tully v. Estes Judge, this is a case that revolves around USERRA and specifically benefits of employment and termination rights. What we want to point out before we go into a lengthy discussion of the abandonment issue is that this case has the potential of upturning Sheehan v. Navy. This case is pretty clear. Step one under the Sheehan v. Navy principle was the appellant was fired because of his military service. That's undisputed. Step two, the reason the agency originally gave for that termination was he exceeded the five-year limit under USERRA. This court in Erickson 1 held that our client, the appellant, did not exceed the five-year term limit in USERRA. That should be the end of this case, and we should have won, but for the fact that abandonment is now coming up. And if abandonment comes up, that's adding a fourth prong to the Sheehan. But both of those facts were present in Moravec. So your argument that this case conflicts with Sheehan would apply equally, I would assume, to Moravec. Now, you may be right in criticizing where this court has gone with the abandonment theory, but this panel has Moravec, Woodman, Dowling as controlling authorities. So the question that at least I would like you to focus on is what would you say by way of distinguishing this case from Moravec? Absolutely, Judge. One of the key things to distinguish this case is that our client was on military leave, agency-approved military leave, during the entire time. The other thing that is clearly important here is that Erickson was not a career employee in the military as defined by the CFRs. He also repeatedly said that he was going to return to military duty, or correction, civilian duty. He repeatedly told the agency, and it's in the agency's appendix, that he's coming back in September 2001 when his orders are over. As we all unfortunately know, something happened in September 2001 which prevented him from coming back, and he's a special forces sergeant major riding horses in Afghanistan. When you say he repeatedly told the agency he was coming back, he was asked in, I guess, 2000, if I have my dates right, when he was coming back, and he said, whenever. He did not, and then he was told, given a notice of proposed removal, and didn't say boo with respect to that or the notice of removal for six years. That is parallel to the Moravec situation, it seems to me. I'm sorry, Judge, but that's not the facts here. On the 25th of January, he said, of 2000, and this is to the appellant's appendix A32, he said, I don't want to quit. I prefer the military for the way they treat you, but my job is with the post office. Most of the arguments have cut off, but my job is with the post office. And to put this in context, on the 3rd of January, the firing official told his supervisor, we're firing him because he exceeded the five-year- the postal service got the dates wrong and were wrong about the five years because of the extensions available to him. But the question really is, what the board, as I understand what the board did, the board took the fact that he didn't say anything at that point, when there was a notice of proposed removal and ultimately removal, he says nothing for five years until, or six years, I guess at that point six years, until after he leaves the military and then nine months later he says, I want to get back. I'm sorry, Judge. What did he say between the time of the notice of proposed removal and the time he leaves the military that would indicate to the postal service that he wanted his job back? Judge, I'm sorry, but from the beginning there, that's not reflected in the fact pattern here. If you go to the agency supplemental appendix at A, I believe it's A15, A16 and A17, he tried to come back. He filed a union grievance trying to get his job back within minutes of finding out that he was fired. And that is in their brief. In addition, he, on the 25th of January, as recorded by the agency's human resource official, he said, I am coming back in September and you guys are wrong. September of what year? September 2001. He's on military orders. All right. And if I don't have the site readily accessible, I believe it's A32. The agency's human resource official wrote down in her contemporaneous notes that he said he's coming back in September 2001. And he disputed that you can't fire me in that telephone conversation. He said you cannot fire me. I'm still protected by USERRA. What happened with that grievance? It was dismissed because he was fired. He was trying to get his job back, and the grievance basically, you couldn't get your job back because you have to fight under USERRA and you can't go through the union grievance process. Was the grievance related to his job or the handling of some debt? Judge, I would argue it's a pro se pleading in an informal union environment. And the exact quotes in there clearly delineate to me. The quote is, I feel that they should not be. Where is this? This is Agency Supplemental Appendix A15, 16, and 17. And it says, you know, on March 5th, 2001, minutes after learning he was fired, he filed a grievance in which he stated, and I quote, I feel that they should not have been able to take my job away and terminate my employment as I was out on government orders. I request that the US Post Office make me entirely whole. That is a pro se person's comments in an informal matter. And this was months before he was about to come off active duty. So he's coming off the military training. He's ready to go back to the post office, and he says, hey, I just found out I got fired. What's this about? And they said, nothing you can do. Go to the union. The union says, well, let's fill out this grievance. And the grievance goes somewhere. Nobody knows. September 11th comes around. You said the grievance goes somewhere. Nobody knows. Again, do we have in the record what exactly happened with respect to the grievance? Judge, this record is not very good. This is the same record you two had two years ago. Because when it went back to MSBB, the record was not developed on the abandonment issue. So it is not in the record as to what happened. And I don't want to go outside of that. In my opinion, MSPB should have developed this record much better for this court, because right now it's a lot of he said, she said. And I would argue that under the Supreme Court precedent, you have to side in favor of the veteran when it comes down to those types of issues. When he had his discussion before his removal in 2000, he said something like, well, I can't come back until my orders are completed in September 2001. Can I put that context to that telephone conversation? On the 3rd of January, the fire official said, let's fire. On the 4th of January, a human resource person or Erickson's direct supervisor started sending out letters to his military commander saying, you're under investigation. She, if you read her email, she says that she called everybody in the National Guard all the way up to the ombudsman in Washington, D.C. My client gets called in one morning from his commander, and his commander's commander got a phone call, whose commander's commander got a phone call and said, you need to call this woman. So on the 25th of January, he's a little bit perturbed because he's doing military duty. All of his commanders are upset. He gets on the phone, and what does she say? You need to resign. I'm not resigning. I'm coming back to the post office. And he said, but I'm not coming back until September 2001 because I'm on orders. I'm on orders. Right. So my question is this, that by September 2001, would that have taken him beyond the five-year window? Judge, I believe that's hypothetical, and I believe the answer to be no. Why is that hypothetical? Because there were several facts that occurred after he got fired that determined whether or not he still would have had the five years or not. I'm of the position that he still has five years in September 2001 because he would have had more of the exceptions under USARA. This is not a clear cut, you know, he went to Pittsburgh for five years. He is a special forces soldier, and special forces training is exempt from the five-year rule. Every time he went to war was exempt from the five-year rule. This is not your normal National Guard cook. So when we went through his 23 years of military service, on a layperson, which is what the post office saw as, hey, this is excessive military. You're fired. But when you go through it line by line, you start minusing out exceptions to exceptions to exceptions into USARA, and he comes out clean. Does that exception require mandatory military service or voluntary military service? There is no distinction under USARA between voluntary and involuntary military service. As a matter of fact, USARA outlaws that. Under the VRRA, which was a precessor for USARA, you could only do involuntary service and get certain types of credit. USARA says you can't take into account whether or not it was voluntary or involuntary as long as he doesn't exceed the five-year rule. I thought USARA required the MSPB to take a look at the obligated service versus unobligated service. Not true, Judge. The obligated service is an exemption. So let's say, for example, Sergeant Major Erickson has to go to special forces school. That is a required school for his continued military service. That is exempt from the five-year rule. Even though he volunteered to go? Even though he volunteered to go. We have not had an indentured military since the 1960s, 70s arguably. Everybody volunteers. If you're in the National Guard, you're volunteering. So you can't say, well, he's in the National Guard. He volunteered for it. That would completely cut through what USARA is for. USARA is to protect the reservists and also to have senior leaders in the National Guard and Reserve to train the younger kids. He could volunteer for National Guard duty, but did he volunteer to go on active duty? I believe. Was he called up on active duty? He has been called up. He has more war decorations than there are judges on this panel. I understand that. But it's a situation where I think the statute might require a distinction, a differentiation between people who volunteer to go on active duty versus people who are called up to active duty. Is there such a distinction? I don't believe. I believe that distinction that you use has been specifically outlawed in USARA. So I believe the distinction that you used, when USARA took effect in 1994, they specifically said you can't differentiate between voluntary and involuntary service. So I— No, not voluntary or involuntary service, but you can volunteer to go into the National Guard. Is that correct? Yes. That's the only way to get into the National Guard. You don't necessarily need to volunteer to go on active duty from the National Guard. You can be called from the National Guard in case of an emergency, as it's been done since 2001, since 9-11. Absolutely, Judge. But you also have to obtain certain schooling that puts you on active duty. So Mr. Erickson's case, he's a Special Forces soldier. He required to be certified as a National Guard Special Forces soldier a minimum of two years of active duty and training. Then once he came out of that, he had to go to Airborne School, which was another month of training. Then he went on to Pathfinder School. All of those schools are active duty that he had to do in order to complete his MOS, his military occupational specialty. That's why when the post office said you exceeded five years, if this was any other case, that probably would have been a valid argument. But because of the highly skilled technically advanced training that he has gone, he has done a lot of military duty. But it is to make it so that when the alarm bell goes off and the President needed a Special Forces soldier in Afghanistan three days after 9-11, they called Rick Erickson. To continue with the line of questioning of Judge Gaius, I had the same question. Let me see if we can get at it this way. Was there a point? I understand that if you're in the National Guard, A, you volunteer for the National Guard, and B, you're subject to being called up. Once called up, you're subject to things like stop-loss orders, all of which are mandatory and, in a sense, involuntary, in that even though you initially volunteered, you're nonetheless put in a position that you don't have a choice at that point. Now, the question that I have, and I think Judge Gaius's question as well is, was Mr. Erickson, during the time he was serving with the military and after his mandatory active duty training, was he called up involuntarily for further active duty or did he volunteer for further active duty at that point? He was involuntarily sent to Afghanistan. Okay. And was there any point thereafter, before 2005, that he voluntarily extended his active duty tours? Yes. He extended it when he could not return to his job in September 2001 and he had no other opportunities. He extended it to mitigate the damages. I see. All right. And that was voluntary? That was voluntary. He quickly turned into Afghanistan. How often did he extend after September 2001? Just once? Can I just clarify this? Because back in my office, people were confused about these extensions. There is an active duty extension, which is the Woodman extension, where on active duty he extended for two years, three years, six years. Erickson's multiple extensions were in the National Guard. They were not active duty extensions. So he volunteered, he reenlisted in the National Guard, never the active army, for four years at a time. So Woodman's case, he reenlisted on active duty for four years at a time, three years at a time. Very different, and a lot of the civilians in my office did not understand that. They understand multiple extensions as in multiple extensions on active duty. You could be in the Guard. I'm in the Guard. I've extended five times. It's one week in the month, two weeks in the summer for me, for Erickson. But the question that we're really trying to get to, I think, at least today, but I think all three of us are trying to get to is, did there come a time, and if there did, how many times and at what points did there come a time in which he had the choice of either continuing on active duty or returning to a non-active duty status during the period between 2000 and 2005? Judge, it's not in the record, and I don't want to put myself into a position of saying something that's not in the record. This record's not fully developed, and I couldn't tell you. I can tell you a gut impression which does absolutely nothing. It is not nearly as egregious as Woodman. It's not nearly as egregious as Gale. This is a man who wanted to work for the post office but also wanted to, when World War III broke out, to go and kill our enemies. And he got that until the post office fired him, and they fired him because he exceeded the five-year limit, which we proved was a pretext. This issue of abandonment, it's predominantly tied to his comment on January 24th. On January 3rd, they said that they were going to fire him. There's an email in the record from the hiring official that said he is to be fired. All this about what he said on the 25th, they were going on to say something that they could use against him. The proposal letter and the firing letter all talk about you've exceeded your five years, that's why you're fired. This abandonment issue is a legal issue that came up by a clever attorney six years later. The fact of the matter is he was fired because he exceeded five years of military leave, and the post office miscalculated the law and found out that they shouldn't have done what they did. That's the bottom line. Okay. We'll hear from the government now, and we'll restore your rebuttal time since we asked so many questions. Mr. Perham. Good morning. It may have pleased the court. If I could just answer Your Honor's question. Your Honor asked whether there was a time after his removal when Mr. Erickson voluntarily reenlisted in the military, and the answer is yes. In 2004, he voluntarily reenlisted for an additional year. I believe that's at sub 39. Well, now, let's make sure we're all on the same page here. Did he voluntarily reenlist in the National Guard, or did he voluntarily accept or offer himself for active duty? Mr. Tully is drawing that distinction, and I can see that it makes some sense. Well, I'm not sure the distinction matters in this instance because the fact is he was serving full time regardless. Well, before we decide whether it matters, which was it? I don't know the answer to Your Honor's question. I don't know if it was National Guard or full time. I believe it was National Guard, but it was full time. He did acknowledge at his deposition that he voluntarily extended his service, I believe at the end of 2004, and his service then lasted until the end of 2005. But wasn't he on active duty at that particular point in 2000 when all this issue came up? Yes, he was. Yes, that's right. Don't we really need to go back to that year in that 2004-2005? He was certainly on active duty in 2000 when he was removed. He had voluntarily extended his service, I believe in 1999, for an additional three years. It was in the National Guard. That's right, in the National Guard. What's important, of course, here, the Court remanded this case back to the Board to consider the factual question of whether Mr. Erickson abandoned his civilian career with the Postal Service in favor of a military career. The key question, then, before this Court is whether the decision by the Board is supported by substantial evidence. And if we look at the facts here, now, Mr. Erickson, his arguments in his briefs and today largely are an effort to overturn this Court's precedent. This Court cited Woodman, Moravec, and Dowling when it remanded the case to the Board. Mr. Erickson, for example, says, well, the law is clear that unless you've exceeded the five-year time limit under USERRA, you're automatically entitled to USERRA rights. That simply isn't true. But in all of those cases, though, you had 14 years in Woodman, Dowling had 12 years, and in Moravec it was 16 years. But they weren't above the five-year cap because the service in those cases was exempt for one reason or another. Well, Woodman was, I think, affected by the fact that the five-year cap didn't come in, didn't become effective until sometime later in his period. That's right. He was gone for a long time. Well, interestingly enough, actually, while he was certainly gone for a long time, his total service was actually less than Mr. Erickson's. Woodman served a total of 20 years. Mr. Erickson testified his deposition that he served a total of 23 years in the military as of the date of his deposition. And one of the key factors in Woodman that this court focused on was the fact that the employee in Woodman had voluntarily reenlisted. In Woodman, it was three voluntary reenlistments. Our case, actually, it was five voluntary reenlistments prior to the removal in 2000, and then a sixth voluntary reenlistment in 2004. Reenlistment in the National Guard. That's right. Not an active duty. We wouldn't be here if all he had done is reenlisted in the National Guard and had been going two weeks during the summer and one weekend a month. I mean, the Postal Service doesn't have a problem with the reenlistment in the National Guard. No, certainly not. What's key here, well, the question, again, is based upon the totality of the facts and circumstances. As this court said in Moravec, can this be characterized as a temporary non-career hiatus in his civil service career? Certainly not in this case. Certainly not a temporary non-career hiatus. In addition to the length of his voluntary service, the last four years that he was employed by the Postal Service, 1996 until his removal in 2000, he worked for four days in the Postal Service, four days. The entire rest of that time, he was serving in the military. Again, he had five voluntary reenlistments, so on five separate occasions prior to his removal, Mr. Erickson made the conscious choice of continuing to serve in the military. To serve in the military, but not, let's, henceforth, when we talk about service in the military, let's only refer to active duty, okay? Because I really think the whole National Guard thing is a bit of a red herring here. If you all can say, look, he was volunteering for active duty, then that's pertinent. If all he was is re-signing up for National Guard without also either directly or indirectly agreeing to active duty, then it's a whole different kettle of fish. I believe he was in active duty. Well, he was certainly in active duty. The question was, was that voluntary on his part, or was he being required to continue his active duty service? In terms of his intention to return to his Postal Service job, that seems to me to matter. Our understanding is he was not required to continue to volunteer. When he had five voluntary extensions, at each point, he could have opted not to volunteer. In other words, not to volunteer for the National Guard. That's right. He didn't have to continue serving. All of those extensions were before his removal. Five of them were before his removal. The last extension was at the end of 2004. What relevance is that to the question of whether he gave up his Postal Service position? Well, in fact, Mr. Erickson, one of the arguments he makes is that he says that anything post-removal is irrelevant. That simply isn't the case. His actions after he was removed from the Postal Service in 2000 indicate that, yes, in fact, he did intend to pursue a career in the military by continuing to serve until the end of 2005. He didn't have a job at the Post Office at that point, did he? No. When he was removed? No, obviously not. No, but keep in mind that he— So why wouldn't he go into the military at that point? Well, he had already signed up for a three-year extension at that point, which lasted for another year or two. But did he sign up—I'm still confused. Is the Post Office saying that when you sign up for National Guard duty, you are volunteering for active duty at that point? Or because you're eligible for active duty to be called up as a National Guard member, then you are forsaking your position in the Post Office? No. And, in fact, I think one has to, again, look at the facts and circumstances as a whole of this case. Certainly, if the employee had volunteered, regardless of whether it's active duty or temporary, you know, one month, a couple days each month, the question is have they abandoned their Postal Service career? And, again, I have to go back to the facts of this case, which is Mr. Erickson served for four days, worked for four days in the Post Office during the last four years that he was employed. He had extensive absences. Up to 2001? Up to 2000. He was removed in 2000. So from 1996 until 2000, four days, and I think the last day was actually the end of 1996. So he had all of 1997, 1998, 1999, and the beginning of 2000, he didn't work a single day at the Post Office. Let me see if I understand what the Postal Service's position would be under these circumstances. I joined the Postal Service, and I want to be working for the Postal Service, but I also want to do military service. I want to do, let's suppose, the maximum amount of military service I can do without forfeiting my government job. So what I say is I want to work for up to five years for the military. I want to go into the military for up to five years. I've read USERRA. That seems to permit me to do that. So I sign on, and I volunteer, and I go for five years. Then presumably in that situation, you would not argue, as long as I've made my intentions clear to come back after the five years, plus extensions, plus whatever period of time USERRA gives me to be in the military, you wouldn't argue in that situation that I've abandoned my civilian career, would you? Under only those facts, if the employee has no other indicia that they're abandoning their Postal Service career, I mean, that's a very different case from our case. Other than his little conversation with the Postal Service representative about preferring the way they treat people in the military to the way they treat people in the post office, which doesn't come to a whole lot, it seems to me, what's the difference up to the point that he's removed? Well, again, he had five voluntary re-enlistments. Well, but I do, too. Remember, I'm going to volunteer for my five years. I'm going to take advantage of the maximum that I'm entitled to. But I'm telling you all along, I'm coming back to the Postal Service. You can't argue abandonment in that situation, can you, or would you? I think you potentially could, because remember, it's not simply what you say if all of your actions indicate to the contrary. No, my actions are, I'm coming back. I make it as clear as I could. I can say, you know, I have read the statute, and I know that I'm entitled to five years, and I'm going to take advantage of it, and I'm coming back. And the five years will not give me retirement. I want to retire out of the Postal Service. I'll see you in five, plus my training period. You wouldn't argue abandonment in that situation, would you? Well, I would say it would certainly be a more difficult case than the case that we have today. In addition to the fact that Mr. Erickson stated a clear preference for serving in the military, had numerous voluntary extensions, as I said. My case has voluntary extensions. So the difference so far, the only difference so far is the little conversation with, what was her name? Ms. Wagner or something. Yes. The other differences are, in Mr. Erickson's case, he had a lengthy military career. He served for at least 23 years in the military, 17 years by the time that he was removed. Fewer than five countable years outside of, within the scope of USERRA. But what this Court has said is that given the purpose of USERRA, which is to protect non-career benefits, USERRA simply doesn't apply to a situation where an employee abandons their position. And another distinction between Your Honor's hypothetical and this case is that, keep in mind, in 1999, the end of 1999, the Postal Service sent Mr. Erickson a letter saying, Please provide us with more information. He didn't respond to that letter. In January of 2000, they sent him a second letter and said, We've set up a scheduled interview with you for January 24th. He didn't show up for the interview. Now, the next day he did call. That's when he had the discussion we referenced earlier. In February of 2000, the Postal Service issued a notice of proposed removal. Now, one would think at that time, if Mr. Erickson's job were truly in the post office, he would have objected to the notice of proposed removal. He would have said, No, no, the post office is where I want to be. And then a month later, the post office issued the removal letter. Again, one would think that if his job really is with the post office, Mr. Erickson would have said, Hey, you've removed me improperly. This is wrong. Well, hence his grievance. Well, but the grievance was over a debt repayment. It wasn't a USERRA grievance. And I believe this Court actually, in the prior case, in the prior appeal, I believe this Court actually said that that is the case, that he acknowledged. Well, there's no question that the grievance is formally regarding collection of debt. But he does say in the course of the grievance, I feel they should not have been able to take my job away and terminate my employment as I was out on government orders. But if anything, the grievance shows all the more that he should have brought a USERRA claim if he really, truly believed that the post office is where his job was. He was certainly aware of his USERRA rights. As Your Honor mentioned, the grievance references the USERRA rights. But the grievance concerned a debt repayment. The fact is he did not contest his removal until the end of September 2006, more than six years after he was removed, and nine months after his military service. Yet he had the time and the wherewithal to file a grievance over a debt repayment. So, no, his position was not in the Postal Service as he claimed. But he did not contest the removal that we have subsequently determined was inappropriate. So the question I have is to what extent is that relevant to the question of whether his AGR duty was career military service. As I understand it, that's the question before us. USERRA is designed to encourage non-career service. The question is, well, fine, if he was engaged in career military service, then in effect he's forfeited his rights under USERRA. That's right. So what evidence is there that his AGR duty was career military service? It seems to me you can't look to his four or five extensions of his National Guard duty during the time he worked for the Postal Service. I don't see how that's at all relevant. So the question is what evidence is in this record that was considered by the Board that points to the conclusion that his AGR duty was career military service? First, if I could just reference the definition of non-career service, which I think may have precipitated Your Honor's question. Of course, that definition doesn't address abandonment under USERRA. But moreover, that was the same argument that was made in the Moravec case. In Moravec, the employee said, my case is different from Woodman because I'm not eligible for a military retirement, which is what Mr. Erickson has said here as well. And this court said, no, you misunderstand Woodman. Woodman is not focused on any one particular fact. Rather, the question is the totality of the circumstances and whether the service can be characterized, again, as a temporary non-career hiatus in your civil service career. Now, given Mr. Erickson's lengthy and voluntary service in the military, and again I go back to the fact that he was gone for between 1991 and 1995, he was absent for extended periods of time from his Postal Service career. And moreover, in the last four years, as I said, of his Postal Service career, in the last four years he worked four days, four days. The rest of the time he was serving in the military. So all of that is evidence that, yes, he opted for a career in the military over a career in the Postal Service. But all of that clearly was protected under USERRA. It is, but what this court has said is that even if you fall below the five-year cap in USERRA, this court has said that given that USERRA's purpose is to protect non-career service, there are instances where, even though you don't hit the cap, you nonetheless have opted to pursue a career in the military. Woodman had not exceeded the cap. I don't believe Morvick and Dowling either exceeded the cap. Otherwise, the court wouldn't have even been talking about abandonment. And that's one of our points is that Mr. Erickson is attempting to, asking this court to overturn that precedent and put a strict five-year cap. Because it seems to me we've got, you know, very few facts here to look to. The board talked about the time of service you just referred to, that he was in his fifth voluntary re-enlistment, et cetera, and had served the last four years continuously in the military. So on the one hand, you could say, well, maybe that shows that he was career, his AGR was career military. But not necessarily. Okay? So that's one factor that may or may not answer the question. And then the board turns to his expressed preference for military over civilian service. And that's simply a comment that he made about, well, you know, I prefer the military. That doesn't necessarily, I think, is a pretty weak indicator of the fact that he was serving a career military position. Again, of course, the standard is whether there's substantial evidence that supports the board's decision. But that's what I'm looking for. And if you look at the context of his statement, he was asked to choose. He was asked, which do you want to pick, the military or the postal service? And he said he didn't say, I choose military. He just says, I prefer the military over the postal. That's right. But when asked that question. So if I say, well, do you prefer A or B, and you say, I like A better, that's indicating a preference for A. Well, but he was asked point blank at that point, are you prepared to resign your civilian position? And he says no. Right? That's right. And it seems to me that anything else he says is really just sort of a codicil to the basic point, which is he's being asked in the most direct way, are you going civilian or are you going military? And he's saying in a pretty clear fashion, it seems to me, I'm civilian. I'm just on a military hiatus. A lengthy hiatus, to be sure, but a hiatus nonetheless. It's certainly not a temporary hiatus. But I would also say that. I don't know. Temporary can include five years. Why is that not temporary? I would say that. Maybe even more if you're not volunteering. I would say that actions speak louder than words. Again, Mr. Erickson, he had served four days in the previous four years. Well, that could be, but you can't then say, notwithstanding that the words didn't indicate an intent to abandon his civilian position, nonetheless we'll use the words as part of the substantial evidence. I mean, it seems to me that that conversation is a net negative for the government in this debate as to substantial evidence. Because he's saying, I'm coming back, even though I'm not wild about the way you guys treat people. And if he was coming back, he wouldn't have voluntarily reenlisted in 1999. Yeah, now you're coming off the conversation. You're citing the conversation as something that's part of the substantial evidence. My submission to you is you've got to take the conversation and pretty much toss it aside. So what have we got left once we get rid of the conversation? Well, I respectfully disagree, but what we have left is— All right, if you disagree, tell me why, given our discussion we've had here, there's anything to that conversation other than support for the proposition that he intended to come back. He said, yes, I intend to come back down the road. But what he also said was, I prefer the military. I like working at the military better than the post office. So where's abandonment in that conversation? And again, that is simply one indicia that he preferred his military career over a postal service. However, there were two findings made by the board which concluded at paragraph 9 of A5, we find the appellant's expressed preference for military over civilian service especially significant in that regard. So that's your statement, that he made a preference for military service. That's right. And we also find that the appellant's failure to respond to the notice proposed removal as to the grieve or file a Chapter 75 appeal of the removal. So those two findings were based on, first of all, his statement that he preferred the military over postal service and that he did not grieve the removal. That's correct. So those were the only two findings for abandonment. No. It wasn't simply that he didn't grieve the removal, but he also didn't respond. Didn't respond. To the proposed removal. That's all they have for their findings. No. The other part of the finding is that Mr. Erickson had a lengthy service in the military, including serving, as I said earlier, nearly for four years continually in the military. That wasn't a footnote. That was not the finding of the body of the appellant. I believe that the board referenced that in its decision. It's in a footnote, footnote one of page A-5. That was the entire finding of the board. We find this and we find that, period. I guess I would say that at A-5, although the very beginning of the paragraph nine, although the appellant's continuous full-time military service at the time of the alleged USARA violation was not as lengthy as that of the employee in Woodman. In Woodman. That's right. There are other circumstances here that also demonstrate abandonment. Right. And then they find, the next sentence is, we find the appellant's expressed preference for military over civilian service especially significant in this regard. That's right. That's the first finding. The second finding, in addition, we find that the appellant's failure to respond to the notice of proposed removal would agree with the filed Chapter 75 appeal, weighs in favor of the finding that he intended to abandon his civilian career. Then they footnote the military service. And at the end of paragraph eight, the board also noted that at the time of his removal, the only alleged USARA violation still at issue, the appellant was serving his fifth consecutive voluntary reenlistment and had been serving full-time in the active guard reserve. Do we consider that a finding by then? They didn't put that in paragraph nine. It's part of the analysis section, Your Honor. The previous page has a header analysis. But as I read that, there were two findings. Well, the other finding is that at the time of his removal, he was serving his fifth consecutive voluntary reenlistment and had been serving full-time for the last four years continuously. For six of the past ten years. And then there's no determination as to whether or not there was voluntary service or involuntary service under USARA. Well, the determination was that he had five consecutive voluntary reenlistments. Well, if that's the case, then we might need to take a look at that statute specifically, don't we? As to whether or not the five years were there. I'm not sure I understand Your Honor's question. Well, to determine whether or not the five years were totally voluntary on his part, a voluntary active duty versus five years of mandatory active duty, a call-up as a National Guard member. That's a differentiation I think that USARA does make. It may make that differentiation. But the question here is, regardless of the five-year cap, is the Board's decision supported by substantial evidence that Mr. Erickson abandoned his position? You can abandon. I think it's clear under this Court's precedent that one can abandon their position, but technically not reach the five-year cap because one may have exceptions, as was the case here. That's right. Well, except that Woodman is a special case because of the fact that the five-year cap came in. It was prior to USARA, yeah. But Moravec is a pure five-year case. That's right. But our point is that this Court obviously can't overturn that precedent. So the only question is, is the Board's factual findings supported by substantial evidence? And I would just cite, Judge Garrison, in answer to your question, I would also cite at the bottom of Page A5, Paragraph 10, however, in our view, the circumstances presented in this case considered together are comparable to those our reviewing court has found sufficient to constitute a waiver of USARA employment rights. And then they cited Woodman and then the Godot case as well. So unless the Court has any further questions, we respectfully request that the Court affirm the decision of the Board. Very well. Thank you. Thank you, Mr. Graham. Mr. Tully, a couple of minutes rebuttal. Thank you, Judge. With regard to the letters, I would point out that the MSPB never determined when those letters were actually received by the appellant. And that issue is in a major dispute. The post office sent the letters to his home of record, but he was deployed in the military. He didn't get it. They also sent it to a military address, which he did not work at. So the MSPB's reliance on the fact that he didn't fight the proposal notice or the removal notice, it was not established that he ever received either of those notices until he filed that grievance. And in that grievance, he said, I found out that day that I was fired. So it's kind of unfair to penalize my client when it's not in the record of actual service, other than that it was mailed. It didn't say, was it returned? It didn't say, was anybody signing for it a certified mail? It's completely difficult to determine that. Judge, with regard to your question about voluntary service, USARA 38 USC 4303 defines uniformed service means armed forces, the Army National Guard and the Air National Guard when engaged in the health for training in active duty or full-time National Guard duty, the commission service, and other categories. And there's no definition there of involuntary service, but at 4312H, it specifically says you can't penalize somebody for voluntary service. So 38 USC 4312H. With regard to what the appellant said, it's pretty clear. I encourage the court to review what was said, and that's at the appellant's brief A32. It says that he's coming back, and he says it's coming back to the post office. And I would encourage the court to review the notes on the supplemental brief at A22 and 23 about what the human resource official said and what her take was. But the bottom line is the four reasons why MSPB held abandonment, the length of service, by USARA specifically outlawed. Under 4312H, you can't take into account the length of service and determine somebody's eligibility. The multiple requests for extension, same thing. Under 38 USC 4312H, you can't take into account multiple reenlistments. Well, that would be in the subsection C. It does not exceed the five years, except that any such period of service will not include any service. And then they talk about the initial period of obligated service and so on. Right, Judge, very good point. Under H, it has three prerequisites. One, you gave notice of your duty, so basically you had to be out on military leave. Two, your military leave was protected by USARA under five years, and you asked for reemployment. The agency brought up the fact that he didn't ask for reemployment, but that's because he got fired, so he shouldn't be penalized for that. But assuming that he is on paid military leave, assuming he has under five years, he's protected without regard to the duration, the length, all of those other factors, which the law specifically allows him to do. And all he's looking to do is take advantage of the protection so he can go and protect us. And I would urge the court to just consider the implications of Sheehan on this and whether or not if the court sides with abandonment, is that now going to open up the floodgates for every other defense attorney in a USARA case to say abandonment, irrespective of the length of time? Well, no, I think I have my answer to that. I think abandonment is a lot like obscenity right now, Judge. You know what it is when you see it, but what that does is create a lot of litigation. Well, actually, I'm not sure I would have necessarily agreed with you, but Mr. Preheim told me that it's somebody who just had five years with no other facts. He said, I'm going to serve my five years, but I intend to come back. Could be found to have abandoned his civilian career, which gave me, frankly, some pause. Judge, if we want to get into a scholarly discussion about this, abandonment is judicial activism at its extreme. The law here clearly delineates what are the defenses on USARA. It clearly delineates almost everything there is about USARA. Abandonment is judicial activism and not judicial conservatism. Well, that seems to me maybe taking the ball and running a bit with it. If to take a case different from the one I put to Mr. Preheim, instead I have a case in which I say to the human resources person, I'm not coming back to the Postal Service. I'm out of here. I have no intention whatsoever of coming back, and I put myself into a military job that involves potentially going all the way through to retirement, and then for whatever reason, I decide much later, but still within the five years, to come back. I think I'm subject to abandonment, and I don't think it would be crazy for a court to say, that really isn't the kind of thing that USARA was intended to protect. You wouldn't disagree with that proposition, would you? The proposition that I would propose is a prima facie... Before you get to your proposition, how about my proposition? Do you disagree with me that that would be a reasonable circumstance in which the five years wouldn't have been necessarily violated, but it would be reasonable to conclude that the person had abandoned his civilian position? I believe that without written, knowing, knowledgeable release of your USARA rights, you cannot abandon them. If I told the HR manager that I have no intentions of coming back, you're still protected by USARA. If I put it in writing, I believe that changes the ballgame. This proposition that I throw out that I think is relatively reasonable is, if you're protected by USARA, there should be a prima facie showing that you can abandon. So if that is the case, if there's a prima facie showing that there is an abandonment, the agency has to attack that showing. In this case here, the agency has put up affirmative defense that we're trying to knock down. It shifts the burdens, and it doesn't seem to be fair, especially in light of the Supreme Court holdings and veterans' benefits, and in light of the facts of this case where this is a war hero. If there was a better plaintiff, I haven't seen them. This is the perfect plaintiff who, on the week when he's not going to war, he's delivering mail, but yet he's getting parachuted in and riding horses in Afghanistan a few days after we get attacked. Thank you, Judge. We thank both counsel. The case is submitted.